[No. 2514-2.   Division Two.   July 17, 1978.]

SANDRA COOK, *Respondent,* v. NATALIE GISLER, *as Guardian,* ET AL, *Appellants.*

*William S. Howard,* for appellants.

*August F. Hahn,* for respondent.

SOULE, J.—In the early morning hours of April 13, 1974, the plaintiff, Sandra Cook, shot and killed her then husband, Norman Peterson. In September of 1975 she brought an action to quiet title to an undivided one–half interest in a home owned by the Petersons, which home was the subject of a community property agreement. Defendant, Natalie Gisler, appears as a guardian ad litem for three minor children of the deceased. Norma Peterson and Tamara McManus are also children of the deceased but appear and defend in their own right as adults.

Defendants interposed an affirmative defense based upon RCW 11.84, commonly known as the slayer statute.[1]

Trial was to the court and after receiving evidence, the court entered judgment for the plaintiff. That judgment

---

[1] RCW 11.84.010 reads in part:

"Definitions. As used in this chapter:

"(1) 'Slayer' shall mean any person who participates, either as a principal or an accessory before the fact, in the wilful and unlawful killing of any other person."

was based in part upon finding of fact No. 2 which provides:

> That SANDRA COOK killed NORMAN PETERSON, but that the evidence herein does not show by a preponderance that said homicide was unlawful, and, therefore, SANDRA COOK is entitled to inherit, notwithstanding the Slayer's Act.

We affirm the judgment.

This appeal presents two basic issues, (1) did the trial court apply the proper burden of proof when it required the defendants to establish by a preponderance of the evidence that the killing was unlawful instead of requiring the plaintiff to prove that it was lawful? (2) Is the court's finding of fact No. 2 supported by substantial evidence?

The fact of the killing is conceded. This misfortune had been preceded by an evening spent by the plaintiff and her husband in a local tavern, but no issue has been raised as to the sobriety of either person.

At the trial, the only evidence of the events culminating in the shooting was presented by way of a transcript of the testimony taken at the coroner's inquest. This transcript was received by stipulation as exhibit 2 along with the verdict of the coroner's jury which found the homicide to be justifiable. No criminal charges were ever filed.

It appears, without dispute, that over much of the 6 years of their marriage the deceased had subjected plaintiff to serious beatings. On one occasion her earlobe was partially torn off. Three independent witnesses said they had seen the ear injury and that on several occasions they had seen marks of substantial beatings upon the plaintiff's face and arms.

On another occasion, during a period of estrangement, plaintiff was threatened with an ice pick. In the course of

---

RCW 11.84.020 states:

"Slayer not to benefit from death. No slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in the sections following."

that assault, the deceased had also threatened to kill her, or as he said, "rip [her] apart." In order to avoid the implementation of this threat, she returned to her husband.

Plaintiff also referred to an event occurring shortly before April 13 in which the deceased made an extremely painful sexual demand upon her, over her objection, in the course of which he inflicted great pain upon her by bending her over the head of the bed, "jamming" his fingers into her private parts with great force and saying, "I'm going to rip you apart." Plaintiff stated that this was not the type of activity which might be thought to be for her personal pleasure. She said that it was extremely painful, that she was in pain the next day as a result, and that she should have gone to a physician. She stated that she feared injury could come from such conduct by her husband.

On the night in question, the deceased was again attempting overly–aggressive manual sex–play. She feared a repeat of the previous episode in which he had threatened to rip her apart. She feared injury from it. She knew that she would not be able to take the pain again, and yet feared that if she did not cooperate, she would again be beaten. To avoid the situation, she excused herself on the pretext of needing to use the bathroom. While in the bathroom, she heard her husband getting out of bed. She felt that if she attempted to flee, she would have been pursued and received a severe injury.

Her testimony was extremely vague concerning the time lapse after she left the bedroom. It is likewise vague as to how she came into possession of the gun, a .22 caliber revolver. She does assert that while she was standing in the hall, he opened the bedroom door, at which point, as she put it, "the gun went off." She stated that there were about two steps between them at that moment; however, the powder burns on the body suggest that they were closer. After the deceased fell, she closed the bedroom door and waited for a period of time. About 4:30 a.m. she telephoned her parents in Kalama and asked them to come at once, which they did. About 7 a.m. she attempted to call her

attorney. Finally about 9 a.m. she called the sheriff in South Bend who relayed the call to the resident deputy in Long Beach.

Issue No. 1—Burden of proof.

RCW 11.84.010 by its terms requires proof that the slaying be both willful and unlawful. The defendants argue that the trial court disregarded the presumption of intent which flows from the fact of the shooting and refused to consider the willfulness of the killing. The findings of fact make no reference to willfulness, but willfulness was never a disputed issue. Plaintiff admitted the willfulness of her act in her testimony before the coroner's jury, as indicated by the following excerpt:

Q. Did you, Sandy, mean to kill him? Were you intending to shoot him with the gun?
A. I didn't know of any other way to protect myself.
Q. Did you have to stop him from doing what he was going to do to you?
A. I don't think I could take it any more.
Q. Sandy, are you sure you couldn't have avoided this situation by simply going out and starting a divorce action?
A. I'm sure I couldn't have.

The judge's oral opinion recognized that the issue in this case was not the question of willfulness, but whether the shooting was unlawful; that is, was it justified from the standpoint of self–defense? It would have been better to have had a finding on the willfulness of the act if for no other reason than for the sake of having complete findings, but failure to make a finding on this subject is not prejudicial error because it was not a basis for the court's judgment against the defendants.

*New York Life Ins. Co. v. Jones,* 86 Wn.2d 44, 541 P.2d 989 (1975), cited by defendants does support the proposition that secondary beneficiaries, such as defendants in the present case, have the burden of showing that the primary beneficiary intended to kill the deceased. The court there observed that in meeting that burden, they will

be aided by the presumption that a person is presumed to intend the usual and ordinary consequences of his acts so that the trier of the fact is entitled to find an intent to kill from the fact that the defendant fired a weapon at the victim. *New York Life* further establishes the principle that the primary beneficiary has a right to present her evidence and, if she can, convince the jury that she had no homicidal intent when committing the assault. Argument based upon the cited authority misses the point where, as in this case, the question is who has the burden of proving that the slaying was *unlawful.*

Defendants assert that once the fact of slaying is established, the *slayer* must then establish by evidence that the act was excusable or justifiable, citing *New York Life Ins. Co. v. Jones, supra,* and *State Farm Life Ins. Co., v. Smith,* 29 Ill. App. 3d 942, 331 N.E.2d 275 (1975). Defendants quote what they believe to be the pertinent portion of the Illinois holding at page 947:

> Once the contingent beneficiaries established that the defendant had killed the deceased, the burden was then on her to "go forward" with the introduction of some evidence showing circumstances justifying or excusing her acts, unless it was sufficiently manifest from the proof on the part of the contingent beneficiaries that she was justified or excused in committing the homicide. *But once evidence of self–defense was interposed, whether by the contingent beneficiaries or the defendant, the overall burden of persuasion was placed on the contingent beneficiaries to show that it was more probably true than not true that the defendant did not act in self–defense.*

(Italics ours.)

As we read that decision, and particularly the italicized portion, it refutes the defendants' position that the slayer must establish that the act was justifiable. It appears to us that the only burden upon the slayer is to produce some evidence of self–defense or justification if it is not already

in the case by reason of other evidence, and that the burden of persuasion, the ultimate burden of proof, continues with the defendants.

That this is the correct interpretation of the Illinois case is confirmed by the fact that the case was appealed and is reported as *State Farm Life Ins. Co. v. Smith,* 66 Ill. 2d 591, 363 N.E.2d 785 (1977), in which the court specifically commented on the burden of proof. On page 596 the decision states:

> The applicable rule, correctly stated by the appellate court, is that the burden was on the appellees to prove that the defendant's actions were intentional *and that the killing of the deceased was unjustified.*

(Italics ours.) The appellees (respondents) in that case were the contingent beneficiaries occupying the same relative position as the defendants in the case before us.

Thus it appears that the very case cited by defendant for the proposition that the slayer must establish that the act was justifiable in fact supports the opposite proposition, namely, that the burden of proof is upon the defendants as secondary heirs to convince the trier of fact that the act was not justifiable.

We hold that when the slayer statute, RCW 11.84, is asserted to defeat the claim of one who otherwise would be entitled to inherit, the burden of proof is upon the party seeking the benefit of the statute to prove that the killing was willful and also that it was unlawful.

Issue No. 2—Sufficiency of the evidence to support finding of fact No. 2.

A killing which is justifiable is not an unlawful killing under the homicide statutes then in effect: RCW 9.48-.030, 9.48.040 or 9.48.060. The plaintiff claimed that the killing was justifiable. The applicable portion of RCW 9.48-.170 defining justifiable homicide provided that homicide is justifiable when committed either—

(1) In the lawful defense of the slayer . . . when there is reasonable ground to apprehend a design on the part of

the person slain to commit a felony or to do some great personal injury to the slayer . . . and there is imminent danger of such design being accomplished; . . .

Defendants had the burden of proving by a preponderance of the evidence that the action of the plaintiff was not justifiable, *i.e.,* that she did *not* have reasonable ground to apprehend a design on the part of Norman Peterson to commit a felony or to do some great personal injury to her.

We perceive no substantial distinction between the term "great personal injury" and the term "great bodily harm", which latter term has been held to mean the threat of an injury of a graver and more serious nature than an ordinary battery with the fists or pounding with the hands. *State v. Bezemer,* 169 Wash. 559, 14 P.2d 460 (1932); *State v. Lewis,* 6 Wn. App. 38, 491 P.2d 1062 (1971).

In evaluating the reasonableness of plaintiff's apprehensions, the trier of fact was entitled to consider all of the facts and circumstances known to the plaintiff, including her past experiences with her husband. *State v. Wanrow,* 88 Wn.2d 221, 559 P.2d 548 (1977). Further, the trier of fact was also entitled to give consideration to the relative inability of a woman to repel an attack without resort to a deadly weapon. *State v. Wanrow, supra.*

With these legal principles in mind, we observe that the plaintiff had been the victim of numerous threats and attacks by her husband. During one of these attacks, she suffered a torn ear. In others, she was severely bruised and marked. The decedent had threatened to "rip [her] apart", as well as threatening to kill her. On a very recent occasion, the decedent had made a sadistic sexual assault upon her. In light of this history of abuse and assault, when it appeared to the plaintiff that the decedent was about to attempt a similar sexual assault, she was justifiably in fear not only of serious injury, but also that any attempted escape would, at best, merely postpone the inevitable violence. These facts would have provided substantial evi-

dence on which the court could have made an affirmative finding that the plaintiff had a reasonable fear of "great bodily harm" and that, as a result, the homicide was justifiable. However, the trial court did not deem it necessary to make such a finding in light of the applicable burden of proof. Rather, the court only found it necessary to hold that the defendants had not sustained their burden of proving the killing to have been without justification. While the evidence on this issue may be very close and while this court may have decided this issue differently, we will not substitute our judgment for that of the trial court. *Beeson v. Atlantic–Richfield Co.,* 88 Wn.2d 499, 563 P.2d 822 (1977).

Finally, we are mindful of defendants' contention that the trial court merely deferred to the verdict of the coroner's jury. However, an examination of the court's oral opinion reveals that contention to be without merit. The trial judge stated:

> Particularly, in view of the fact of the defendant having the burden of proof, I can't say that the defendant has met it, that is, proved that this was an unlawful killing. If I had to decide myself, as a mere preponderance of the evidence, I'd be inclined to say that she was justified in shooting him to protect herself. It's a close question if I were to say that. *I don't have to say that in the first place when the burden of proof is the other way.* I'm inclined to agree with the jurors that it was justifiable homicide at the time.

(Italics ours.)

The plain import of that language is that even if the burden of proof were on the plaintiff to establish that she was justified in shooting to protect herself, he would have so found, but it was not necessary for him to go that far in deciding the case. It was then, and only in passing, that the court indicated agreement with the coroner's jury. We find no support for the suggestion that the trial judge merely deferred to the coroner's jury.

The judgment of the trial court is affirmed.

PEARSON, C.J., and RINGOLD, J., concur.