# CHARLESTON.

### P. L. GORDON *v.* CHARLES C. DICKINSON

### (No. 5395)

Submitted November 3, 1925.    Decided November 24, 1925.

1. MASTER AND SERVANT—*If Prior Acts of Misconduct and Negligence of Employee, Condoned by Employer, Are Repeated, Entire Course of Conduct of Employee May be Considered as Justifying Discharge.*

   While knowledge of and condonance by an employer of prior acts of misconduct and negligence of an employee will not justify discharge of the latter, yet if such acts be subsequently repeated, the entire course of conduct of the employee may be taken into consideration by the employer as justification for the discharge of the employee.  (p. 497.)

   (Master and Servant, 39 C. J. § 89.)

2. SAME—*Condonance of Prior Act of Employee Amounting to Breach of Contract is Always With Implied Condition of Future Good Conduct in Compliance With Contract.*

   Condonance by an employer of prior acts of an employee amounting to a breach of contract by the latter is always with the implied condition of future good conduct in compliance with the terms of the contract.  (p. 498.)

   (Master and Servant, 39 C. J. § 89.)

3.  SAME—*Payment of Wages of Employee to Date of Discharge
    Held Not to Constitute Waiver by Employer of Breaches
    of Contract, or to Deprive Him of Right to Terminate
    Employment Therefor.*

Payment by an employer of the wages of his employee to
the date of the latter's discharge will not constitute a waiver
by him of breaches of the contract or deprive him of his
right to terminate the employment on account of such
breaches.   (p. 498.)

(Master and Servant, 39 C. J. §§ 89, 89 [Anno.]).

(NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not
part of syllabi.)

Error to Circuit Court, Kanawha County.

Action by P. L. Gordon against Charles C. Dickinson.
Judgment for plaintiff, and defendant brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*Byrne, Littlepage, Linn, Kelly & Watts,* for plaintiff in
error.

*Murray Briggs,* for defendant in error.

MILLER, JUDGE:

In the court below plaintiff obtained a verdict and judg-
ment against defendant for $1,501.45, which by this writ of
error defendant seeks to reverse.

The basis of the action is the alleged breach by defendant
of his contract of employment of plaintiff as a physician and
surgeon for the period of one year, from July 1, 1923, to
July 1, 1924, to serve the coal miners and their families
employed by the Dry Branch Coal Company and the Coal-
burg Colliery Company.   The charge is that while plaintiff
had entered upon the business of his employment at the time
stipulated and had been and was engaged in the faithful
discharge of his duties, the defendant without any lawful
reason or excuse therefor, on January 15, 1924, discharged
him and refused to permit further performance by plaintiff
of his duties under his contract, as he was able, ready and
willing to do, and had from thenceforth neglected, failed and
refused to pay plaintiff the money due him for the months

of January, February, March, April, May and June, 1924, as provided in the contract.

The contract was expressed in a formal letter, dated June 30, 1923, addressed by defendant to plaintiff, which, omitting the heading, is as follows:

"June 30, 1923.

"Dr. S. D. Gordon,
         Charleston, W. Va.

Dear Sir:

"In accordance with our understanding effective July 1st, 1923, I should be glad to have you undertake the list of the Dry Branch Coal Company and the Coalburg Colliery Company, with the understanding that if the annual returns from the same, together with such outside practice, including that of the Wet Branch Mining Company as you are able to secure by diligent effort does not amount to $400.00 per month, that I will see that an additional amount necessary to make up this $400.00 per month is paid to you, on or before the 20th of the month next succeeding, it being understood, however, that if during any succeeding month within the next twelve months thereafter your income from all sources should be in excess of $400.00 per month, that the said excess amount is to be retained by us as a refund for the amount furnished in accordance with the above understanding.

"I shall be glad to arrange for you a house at Dry Branch at the usual rent, which is not to exceed $10.00 per month, and it is understood that you are to give this work and the welfare of the employees of the Dry Branch Coal Company and the Coalburg Colliery Company your whole-hearted and undivided attention.

"I understand from you that you want your family to stay in Charleston. I should of course like to have the benefit of their good influence at the camp and hope that later on this can be arranged, if not at once, but I think it is important that our understanding be clear that in the event your family continues to live in Charleston, that this fact is to in no way interfere with or keep you away from your work at the Mine, and that in the event you have to be away from

the Mines, that you are to place a competent physician at Dry Branch ready to respond to any calls.

Yours very truly,

(Signed) CHARLES C. DICKINSON."

Very soon after plaintiff entered upon his duties under the contract, numerous complaints were lodged against him by employees of the coal companies, each of whom contributed two dollars per month toward his monthly salary, on account of his absence from his office and their inability to locate him when needed. These were communicated to plaintiff by defendant, or by the superintendent of the coal companies; and some correspondence ensued between defendant and plaintiff in reference thereto. One letter of August 29, 1923, referring to a previous conversation relating to these complaints, advised Dr. Gordon that there was complaint from the employees at Ronda as to his absence when called, and also called his attention to his request that he see Mr. H. H. Fletcher, superintendent, at once with regard to his complaint, and to advise defendant as to the result of his conference with him. The writer notified plaintiff in this letter that the Coalburg Colliery Company had formally advised him that they could not continue plaintiff's services after September 1st, and adding: "Of course, the Dry Branch Coal Company is practically shut down at this time and cannot afford to continue the arrangement made unless the Coalburg Colliery Company continues to join with us."

On the day following, August 30th, plaintiff wrote defendant, advising him that he had seen Fletcher the day he was requested to do so, who referred him to the local superintendent; and saying that he "assured me that so far as he was concerned there was no cause for me to worry and it was all right;" and that he had talked with Fletcher that day, who said, "there was no intentions to discontinue my services."

On September 15, 1923, defendant wrote plaintiff at Dry Branch, that he had word from Fletcher that he was willing to withdraw his instructions to him to stop plaintiff's services on September 1st, with the understanding that if there

was further complaint from his employees on account of his absence from the creek, that his services were to stop on the first of the next month succeeding, and that he desired to confirm this arrangement. Then this letter proceeded as follows: ''It is not for us to say where you should live, but our employees and we pay you a definite salary for your entire time and are entitled to that paid for. As previously advised there would be no objection to you running to town for a few hours once or twice a month, provided you will definitely arrange for another doctor to take care of any calls during the time and will notify the Superintendents of the Coalburg Colliery Company and the Dry Branch Coal Company to the effect before leaving the job. We placed you there and agreed to supplement your salary temporarily, with the hope that you could get the practice of the Wet Branch Mining Company and other practice enough to overcome this, but we know that additional practice cannot be secured unless you establish the reputation of staying on the job, ready to give that prompt and efficient service you are capable of giving, at any time. We do not want to continue indefinitely the plan of supplementing your salary. I write you frankly because I think that it is necessary that our understanding in this matter should be perfectly clear. I am sending a copy of this letter to others interested.''

To the foregoing plaintiff replied: ''It is true I have been absent a few times, but Dr. McPherson, at Sharon and I have mutually agreed to assist one another at any time that such assistance is necessary. I also wish to say that I have broken up house-keeping and stored my furniture, and my children left for school in Virginia yesterday, and my wife is teaching in the schools in Charleston and will spend the week-end here with me, all of these arrangements were made contingent upon my remaining here, and I think it only fair to me that if either you or Mr. Fletcher have any complaint from the employees in the future is to give me a hearing before taking any action. I shall not absent myself from the Creek in the future except on an emergency, and then not without notifying those in authority. I have been notified by my attorney in North Carolina that a suit in court that

involves a title to some property that I am interested in comes up for hearing the 24th of this month, and I had expected to get Dr. McPherson to look after my practice for the three or four days that I would be away, but since receiving your letter, I hesitate to make such an arrangement, although there is very little sickness, and has been very little since I have been here.''

Besides his admissions in these letters, plaintiff as a witness on the trial acknowledged that he had been absent from his duties on a number of occasions; but says that after the complaints made against him in August, he never spent a night away from camp during his employment. He admits, however, that he was absent at Elmo on a Sunday all day; that he was at Charleston on Thanksgiving day from 12 o'clock noon to 8 o'clock at night, and attended a football game on that day, and that he was absent on Christmas day, ate dinner with his family in Charleston. Moreover, the testimony of Williams, bookkeeper for the Coalburg Colliery Company, and of Fletcher, superintendent at Dry Branch, shows that plaintiff, between Thanksgiving day and the date of his discharge in January, was away nearly every day, and without having arranged for any other doctor to respond to calls for him, although on two or three occasions he had represented before going that he had arranged with Dr. McPherson at Sharon to do so. Williams says he talked with Dr. McPherson about this, who said that plaintiff had not called him, and furthermore that he himself had to call Dr. McPherson in Dr. Gordon's absence, which was about every week, and that Dr. McPherson was not always available. Fletcher says that Dr. Gordon's absence got to be an everyday discussion, so much so that the men began talking of refusing to pay him; that this trouble reached its worst phase during the Christmas holidays, when there was a great deal of sickness, and covering the time between December 20th and the first of the year. It is conceded that at a meeting of Dickinson, Fletcher and plaintiff and some of the miners, about November 20th, the subject of Dr. Gordon's absence from the mines was taken up and discussed, on complaint in the meeting by one or two of the men, and when

Dr. Gordon agreed to give better attention to his work so as to give no further cause for complaint. Afterwards complaints continued so that on January 15th following, after taking up the subject with Fletcher, Dickinson directed him to discharge plaintiff, which was done.

We are impressed with the fact that the contract between the parties was a burdensome and exacting one on the part of Dr. Gordon, but it was most important that the men in the mines and their families should continually have a physician on hand whose services could be had at every hour in the day and night, and that was the kind of services the parties to the contract contracted for. Plaintiff understood and appreciated the nature of the contract, and regarded his duties under it as a "bitter pill" to take; but as he undertook the burdensome job, which defendant was very careful to impress upon him beforehand, it was a condition of his continuing in the service, that he should comply with its terms.

On the trial below plaintiff rested his right of recovery, not upon literal proof of compliance with his contract of service, but on the theory of condonance of his breaches thereof, and his willingness and ability to continue therein to the end of the term. His theory of condonance or waiver of the strict provisions of the contract is predicated on the fact that, at or after the meeting of the employees of the coal company with Dickinson and Fletcher in November, and on one or two other occasions, these gentlemen agreed that it would be all right for him to absent himself for two to four hours at a time, if not oftener than once a week, or once in two weeks, if he notified the offices at Coalburg and Dry Branch where he was. These concessions, however, according to Dickinson and Fletcher, were always conditioned on plaintiff arranging beforehand with some other doctor to answer his calls, which they swore he never did, and that many times the office men were obliged to call other doctors to attend to these calls. And Dickinson and Fletcher say that from about December 20th to January 15th, when they discharged plaintiff, he was absent nearly every day, and for a longer time than that indicated by plaintiff, and some days nearly

all day, without making arrangements for any physician to respond to his calls. There seems to be no contention on the part of plaintiff that there was any condonation or waiver by defendant of his neglect of duty between December 20th and January 15th, but only that they had waived his prior derelictions. The proof is that the immediate cause of plaintiff's discharge was for his neglect of duty following the meeting in November. This is made manifest by the letter of January 15, 1924, addressed to him, signed, "Dry Branch Coal Co. H. C. Fletcher," as follows: "Dear Sir: I am requested by Mr. C. C. Dickinson to advise you that on account of absence from Dry Branch during the latter part of December in regards to which you have been several times advised during the last six months and on account of the continued complaint of our employees in regards to this, your services will cease at once."

The proposition relied on by counsel for plaintiff, on the question of waiver and condonation, is that where an employer has knowledge of the misconduct and negligence of his employee and without complaint continues him in his service, such misconduct or omission of duty cannot be made the sole ground for his discharge. But conceding the general rule, defendant's counsel reply that, if there be a repetition of such negligent acts and misconduct, the employer has the right to take into consideration the whole course of conduct of his employee as grounds for his discharge. This proposition seems well founded in reason and authority. In 18 R. C. L., p. 517, § 27, the exception to the general rule contended for by plaintiff's counsel is stated thus: "This rule, however, is subject to the qualification that a master has a reasonable time, after ascertaining that the servant has broken his contract, in which to discharge him—in other words, waiting a reasonable time before acting will not amount to a waiver of his right. Again, if there has been a repetition of offenses the employer has a right to take the entire record into account." The following decisions affirm the same proposition in this way: The fact that a servant is retained after the commission of a breach of duty will not prevent the master from using it as a ground of discharge, if the offense is repeated.

*Gray* v. *Shepard,* 147 N. Y. 177, affirming 79 Hun. 467; *Jerome* v. *Queen City Cycle Co.,* 163 N. Y. 351; *Siselman* v. *Cohen,* 54 N. Y. Supp. 991; *McIntyre* v. *Hockin,* 16 Ont. App. 498; *Hauerbach* v. *Calder,* 15 Utah 371, 49 Pac. 649.

And the law is well settled that the condonation of prior breaches of a contract is always with the implied condition of future good conduct in compliance with the terms of contract. *McIntyre* v. *Hockin, supra; United Oil Co.* v. *Gray,* (Tex.), 102 S. W. 294. This is the rule applied also in breaches of the marital contract and suit for divorce. *Deusenberry* v. *Deusenberry,* 82 W. Va. 135, 138.

Nor will the fact that the employer has paid the wages or salary of the employee to the time of his discharge amount to a waiver or condonation of a violation of his duties. *Bond* v. *Carpenter,* 15 R. I. 440; *Johnson* v. *Van Winkle Gin & Mfg. Co.,* 130 N. C. 441.

The principal point of error relied on by defendant's counsel is the giving of plaintiff's instruction number three, and the criticism of it in general is that, in the light of the authorities cited and relied on, it does not correctly and accurately contain the law applicable to the case. It is as follows: "The court instructs the jury that if they find from all the evidence in this case that the plaintiff and defendant entered into a contract, whereby the plaintiff undertook to give his services as physician for a year, beginning July 1, 1923, in accordance with the terms of the letter introduced in evidence dated June 30, 1923, signed by the defendant and by him delivered to the plaintiff; and you further find that the plaintiff after entering upon the performance of his duties was negligent in discharging them to such an extent as might have justified the defendant in terminating the contract, yet, if the jury further find that such negligent acts were excused or condoned by the defendant, and that said plaintiff thereafter continued to perform, to the best of his ability, all the duties devolving upon him in accordance with the terms of his contract, for a period of several months, and until the date of his discharge, for which period the defendant paid to the plaintiff the amounts due him under the contract of employment, and that at the date of his discharge

the plaintiff was properly performing his duties and able and willing to continue the performance of his duties under his contract, the defendant could not lawfully discharge the plaintiff on account of such former neglect of duty, so excused and condoned, and he is bound to pay the plaintiff the stipulated monthly compensation for the residue of the year, less such sum as the plaintiff may have earned by his practice after such discharge.''

The effect of this instruction was to tell the jury that if plaintiff had been guilty of the breaches of duty assumed, yet if thereafter defendant excused or condoned these omissions and retained plaintiff in his employ and paid him his compensation, and plaintiff was able and willing to continue the performance of his duties as provided in the contract, plaintiff was entitled to recover for the remainder of the term of his employment the compensation provided for. This instruction, it seems to us, ignores the fact relied on, that plaintiff's discharge was based on his neglect of duty subsequent to the acts excused or condoned. The sole defense was not that plaintiff was lacking in skill and ability to perform his duties under the contract, but the fact that he had breached his contract for continuous presence at the mines where he might be called upon at any time to attend the sick miners and their families. The instruction, as counsel suggest, was very skilfully drawn, to keep within the technical rules of the law, and to avoid the defense interposed by defendant. The fact, not denied, that defendant had consented to excuse the breaches of duty by plaintiff down to about November 30th, as we have seen, did not deprive him of the right to discharge plaintiff for subsequent breaches not condoned or excused; and there was no pretense or claim that for the neglect of duty from December 20th to January 15th, defendant did anything to waive his rights, except only the payment to plaintiff of his salary or compensation to the date of his discharge. Such payment, as we have shown, did not amount to a condonation of the breaches of duty occurring during that period, if such breaches actually occurred, a question of fact, of course, for the jury. The instruction was

at least misleading, and should have been made to cover the specific fact of subsequent breaches relied on by defendant.

So, too, we think the court's modification of defendant's instructions numbers two and three was objectionable. These assumed that there was evidence justifying the submission to the jury of the fact of condonation of plaintiff's acts of negligence for the period between December 20th and January 15th, as to which there was no evidence except only the payment of plaintiff's salary, which was not sufficient under the law and the evidence to constitute waiver.

If the law be that breaches of duty condoned will not justify subsequent discharge for those breaches, yet if there are repetitions of the same acts constituting such breaches the former may be considered, then instructions intended to cover the whole case should carefully guard the rights of both parties to the contract.

As we have already indicated, where there is any controversy as to the fact of the breaches and condonation thereof, the questions of fact are generally for the jury. *Batchelder v. Standard Plunger Elevator Co.*, 227 Pa. St. 201, 19 Ann. Cas. 875, note p. 879. There are instances, however, where the evidence is of such a character as to warrant the court in assuming its sufficiency or insufficiency as a matter of law: in such instances the question of waiver is for the court. As we are about to award a new trial, and we cannot know what the evidence will be on another trial, we refrain from expressing any opinion on the sufficiency or insufficiency of the evidence now before us on these questions of breach and waiver.

There was a motion by defendant to set aside the verdict and award him a new trial, which on the record as it then stood should have prevailed. For the errors aforesaid, we reverse the judgment, set aside the verdict, and award the defendant a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*