395 S.E.2d 745

Earl F. SHREWSBERY

v.

**NATIONAL GRANGE MUTUAL
INSURANCE COMPANY.**

No. 19191.

Supreme Court of Appeals of
West Virginia.

June 7, 1990.

Rehearing Denied July 24, 1990.

W.A. Thornhill, III, Beckley, Samuel C.P. Baldwin, Baltimore, Md., for Earl F. Shrewsbery.

C.E. Byron, Jr., Abrams, Byron, Henderson & Richmond, Beckley, Alan Garber, Mason & Martin, Boston, Mass., for National Grange Mut. Ins. Co.

NEELY, Chief Justice:

Earl F. Shrewsbery appeals to this Court the entry of a directed verdict against him in the Circuit Court of Raleigh County in his action to recover damages occasioned by his termination as an independent agent for the National Grange Mutual Insurance Co.

Mr. Shrewsbery, an independent insurance agent in Beckley, became an agent for National Grange Mutual Insurance Co. on 1 July 1980. On that date, the parties signed a contract called the Agency Agreement, which governs the parties' rights and obligations. Mr. Shrewsbery wrote more than seven hundred policies for National Grange during the next five years, with total premiums per year as high as $186,-000, primarily for automobile liability policies and household casualty policies. National Grange found that Mr. Shrewsbery's policies had generated too many losses, and in August 1985 the company gave Mr. Shrewsbery notice that they were ending the Agency Agreement in ninety days (the time set in the contract for termination by either party.) Mr. Shrewsbery does not contest National Grange's decision to end his agency with the company.

The dispute in this case arose over National Grange's treatment of the "expirations," renewals, and commissions on policies Mr. Shrewsbery had written before his agency was ended. Specifically, Mr. Shrewsbery claims that National Grange "ran off," converted, or improperly interfered with Mr. Shrewsbery's possible renewals of policies he had issued to National Grange's insureds.

When National Grange ended Mr. Shrewsbery's agency, the company contacted his automobile insurance customers, as required by regulations of the state insurance commissioner, telling them that their agent was no longer working with the insurance company. This action was pursuant to W. Va. Informational Letter No. 39, promulgated by the Insurance Commissioner on 1 July 1986. Informational Letter No. 39 required that, upon termination of an agent, the insurer must send a letter to each automobile policyholder, informing

him that the agent was no longer with the company, and that each insured had a choice: Remain with the insurance company directly, without an agent; or go to the former agent to investigate taking out a new policy with another company the agent represented. The regulation was meant to protect policyholder's rights not to be cancelled simply because the agent was no longer with the company. Letter No. 39 included a sample form letter for each insurer to adopt. Each company was required to file its adopted form letter with the insurance commissioner, or face "disciplinary action" for not complying with the new regulations.

The form letter adopted by National Grange tracked word-for-word the sample letter promulgated by the insurance commissioner. After mailing the letter to each policyholder, if the policyholder did not respond, National Grange sent another form, to the effect that the policy would not be renewed unless the policyholder elected to do so. Those policyholders who did not elect to renew had their policies cancelled.

In Informational Letter No. 39, the insurance commissioner expressed his own awareness that the new regulation might conflict with expiration rights between insurance company and agent: "While this department is aware of contractual agreements between agents and companies, the company's primary responsibility is to serve its policyholders in a manner consistent with the insurance laws of West Virginia."

Mr. Shrewsbery was free to contact his insureds himself to encourage them to switch to another company he represented. In the case of the agent's household insurance policies, National Grange simply notified each insured that Mr. Shrewsbery was no longer their agent and that they should see him to discuss renewals of their policies. Mr. Shrewsbery could then renew their policies through other companies he

represented or refer them to another National Grange agent.

The agency agreement essentially prohibited the company from using Mr. Shrewsbery's customer list ("expirations") to procure renewals with National Grange through another of its agents. It also gave Mr. Shrewsbery up to one year's worth of commissions for renewals after the end of his agency with National Grange.

Mr. Shrewsbery brought this action against National Grange for breach of contract, tortious interference with contract, conversion, and other claims not before the Court on this appeal. After evidence was presented to a jury, the Circuit Court of Raleigh County directed a verdict in favor of the defendant. This appeal followed.[1]

I. *Tortious Interference with Contract*

It is impossible for one party to a contract to maintain against the other party to the contract a claim for tortious interference with the parties' own contract. Neither party is a stranger to the contract. Each party has agreed to be bound by the terms of the contract itself, and may not thereafter use a tort action to punish the other party for actions that are within its rights under the contract. As to the relations between agent and company, the contract governs. Thus, as parties to that contract, the insurance company could not be liable to the agent for interference with its own contract. In a case on similar facts, the Georgia court has written, "It is generally held that no liability for procuring a breach of contract exists where the breach is caused by the exercise of an absolute right—that is, an act which a man has a definite legal right to do without any qualification." *Williams v. Faircloth,* 259 Ga. 767, 386 S.E.2d 151, 154 (1989); *Schaeffer v. King,* 223 Ga. 468, 470, 155 S.E.2d 815, 816 (1967). In this case, we believe, National Grange's treatment of Mr. Shrewsbery and his customers is not actionable, because the company was simply

---

1. The issues in this case have not come before this Court in quite this way before. Both parties place some reliance on *Bryan v. Massachusetts Mutual Life Insurance Co.,* 178 W.Va. 773, 364 S.E.2d 786 (1987) (*per curiam*). That instructive case was governed by Massachusetts law, however, and is not controlling.

exercising the rights it possessed under the contract between the parties.

If National Grange has acted in violation of its contract with Mr. Shrewsbery, his proper remedy would be an action for breach of contract. In this case, Mr. Shrewsbery has focussed his attention more on the contracts between National Grange and its own insureds than on his own contract with National Grange. In National Grange's relations with its insureds, Mr. Shrewsbery contends, the company has sought to procure a breach of contract between Mr. Shrewsbery and his insurance customers. This interference with contract claim also must fail, because the company is a principal party to the insurance contracts themselves, not a third party. And it is black letter law that no one can be liable for tortious interference with his own contract.

■ Moreover, Mr. Shrewsbery, as an *agent* (in the full legal sense) for National Grange, was not a party to the insurance contracts. Mr. Shrewsbery seriously misconstrues the role of an insurance agent. He is not party to a contract with the insured; rather, he helps the company procure and service the company's contract with the insured. An agent, then, is but an incidental beneficiary to the contract between insured and insurance company. The agent's right to commissions—his economic interest in the insurance contracts—is of no concern to the insured, and solely a matter of contract between the agent and his principal, the insurance company.

■ In a case on similar facts, the Texas court held that an insurance agent had no claim in tort (fraud or tortious interference with contract) for the insurance company's violation of its contract with the agent:

[I]t was plaintiffs' testimony that any contract rights between their agency and the entities to which they were selling group health insurance were to be underwritten Gulf Atlantic [insurance company]. [The plaintiffs] were acting as agents for Gulf Atlantic and the economic benefits they expected from these contracts were to come from Gulf Atlantic in the form of commissions. Perhaps Gulf Atlantic breached its contract with plaintiffs when it refused to honor their agreement and perhaps Gulf Atlantic's conduct in the matter was fraudulent, but we see no evidence here supporting plaintiffs' claim that Gulf Atlantic tortiously interfered with any specific contract rights.

*Hurlbut v. Gulf Atlantic Life Insurance Co.,* 749 S.W.2d 762, 767 (Tex.1987). We agree with the Texas court that disputes between insurance agents and the insurance companies they represent should be settled first by reference to the contract of agency between them.

## II. *The Agency Agreement*

We now look to the language of the parties' Agency Agreement, which provides, in pertinent part:

IX. POLICY CANCELLATION OR NON–RENEWAL

*Subject to requirements imposed by law* and compliance with the applicable provisions contained in this Agreement and within the policy:

...b. Any authority granted the Agent pursuant to this Agreement, shall not be construed as a waiver by the Company of its rights to decline an application for insurance, *cancel a policy,* or *decline to renew a policy.*

X. TERMINATION OR SUSPENSION

...b. This Agreement shall terminate:

...4. Upon either party giving at least 90 days advance notice to the other provided, however, that if the Agent has represented the Company continuously for three or more years, the Company will, if requested to do in writing by the Agent, renew policies that meet the Company's underwriting requirements expiring during the 9 month period following the termination date of this Agreement.

c. The Company will pay commissions to the Agent as specified in Schedule A on the premiums paid to the Company, within one year following the termination of this Agreement, for continuous non-cancellable policies or policies which the Company is required by law to renew.

d. In the event of the suspension of the Agent's authority or the termination of this Agreement, and provided the Agent has and continues to promptly and properly account for the pay over to the Company premiums as provided under the terms of this Agreement, the Agent's records, *use and control of expirations, shall remain the property of the Agent and be left in his possession.* Otherwise, the records, use and control of expirations shall be vested in the Company.

e. During the term of this Agreement and after its expiration, *as long as the records and control of expirations are vested in the Agent, the Company shall not:*

1. *Refer or communicate the names of policyholders and expirations dates to any other Agent, broker or person for purposes of solicitation.*

2. Use, or permit the use of, its records of business placed by the Agent to solicit individual policyholders for the sale of other lines of insurance, products or services, without the Agent's authorization. When the Agent grants such authorization, he shall be allowed the applicable commission or fee on such sales resulting from the use of such records.

f. After termination of this Agreement:

1. ...b. *The Agent shall not receive a commission on,* or be obligated to collect, *premiums for policies renewed more than one year after the termination of the Agreement (because of the Company's legal obligation to renew) or premiums which become due on continuous non-cancellable policies more than one year after the termination of this Agreement.*

2. The Agent shall have authority to service unexpired policies but *the Agent shall have no authority to* accept new business, bind coverage, *renew policies* or issue endorsements.

## XII. GENERAL PROVISIONS AND CONDITIONS

...g. In the event that any provision of this Agreement conflicts with any statute of the state in which this Agreement is to be performed and is more restrictive than the provisions of such statute, the provisions of *the statute shall prevail and define the rights, duties and obligations of the Company and the Agent.*

(Emphasis added.)

### III. *The Agent's Expirations*

This case partly turns on the meaning of the "expirations" that the contract grants to the agent in the event of termination. The term has been well defined by the U.S. Court of Appeals for the Fourth Circuit:

"Expirations" in the insurance field has a definite and well recognized meaning; it embodies the records of an insurance agency by which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property covered and terms of insurance. This information enables the agent to contact the insured before the existing contract expires and arms him with the information essential to secure another policy and to present to the insured a solution for his insurance requirements. It has been determined that this information is of vital assistance to the agency in carrying on the insurance business and it has become, in the insurance field, recognized as a valuable asset in the nature of good will.

*Phillips & Co. v. Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Co.,* 199 F.2d 244, 246 (4th Cir.1952) (applying Virginia law); *followed, Calley v. United States,* 220 F.Supp. 111 (S.D.W.Va. 1963). The *Phillips* court went on to point out the well-settled rule that "expirations" are a "property right" of the agent who produced the business. *Phillips, supra,* at 246; *Kelly v. American Mine Owners' Casualty Corporation,* 161 Va. 206, 170 S.E. 580 (1933).

In this case, Mr. Shrewsbery seems to suggest that "expirations" are the equivalent of "commissions," and that if he has a property right in his expirations, then he has a right to future commissions from the use of those expirations. We disagree. An agent's expirations represent the value of his own work as a salesman of insurance, and are generally protected as his property (unless the agency agreement holds otherwise). Commissions, on the other hand, accrue only when a policy is written or renewed, and are not the inherent property of the agent. As one Virginia court has put it:

> It has been uniformly decided that the right of an insurance agent to commissions on renewal premiums depends upon the contract existing between the agent and the insurer. 43 Am.Jur.2d, Insurance § 187 (1969). The general rule is that unless the agent's contract makes allowance for the payment of commissions on renewal premiums paid by insureds after his termination, he will not be entitled to such commissions after his employment has been rightfully terminated. [*Phillips, supra.*]

*In the Matter of Murphy,* 9 B.R. 167, 177 (Bankr.E.D.Va.1981).

It is clear from the agency agreement that Mr. Shrewsbery had no vested right in National Grange's decision to renew or not to renew any of the policies Mr. Shrewsbery had written. He does not contend that National Grange withheld any premium commissions due on any policies the company did choose, in its discretion, to renew. Rather, Mr. Shrewsbery contends that the company had no right to cancel those policies whose holders did not respond to the company's notice of intent not to renew. Under the letter of the agency agreement, it is clear that the company retained the right to cancel or not to renew any policy; as clause IX. b. of the agreement reads: "Any authority granted the Agent pursuant to this Agreement, shall not be construed as a waiver by the Company of its rights to ... Cancel a policy, or decline to renew a policy." And the agreement unambiguously sets forth that the agent has a right to commissions only for a certain time after his termination, and only for policies actually renewed.

As the company did not violate the *commission* provisions of their agency agreement, Mr. Shrewsbery's claim must rise or fall on National Grange's alleged misuse of Mr. Shrewsbery's *expirations*. The primary use of Mr. Shrewsbery's expirations were as information, that is, they told him whom he should solicit to change their policies over to another company Mr. Shrewsbery continued to represent, as well as what sort of insurance such customers needed and when they needed it. As to the expirations, then, the ball was in Mr. Shrewsbery's court. If he did not use the information aggressively, and therefore lost some of his customers, he cannot be heard to complain about that here.

What Mr. Shrewsbery might complain about is any actual violation of the agreement provisions on use of expirations. The company agreed not to give information it had about Mr. Shrewsbery's customers to other of its agents. Mr. Shrewsbery's old customers, therefore, would have to renew with the company directly (an inconvenience, perhaps, for them), go with another company, or find another National Grange agent on their own.

It is undisputed that National Grange used Mr. Shrewsbery's expirations only in a way mandated by state law, that is, to give its own policy-holders notice, *as required by the state insurance commissioner,* that their agent had been let go and that the policy-holders had certain options. National Grange's actions were not *wrongful,* as Mr. Shrewsbery contends, because the company acted pursuant to the mandates of state law. It cannot be that one can be liable to a private party under a state's tort law for doing exactly that which the state government itself has instructed him to do and threatened him with a penalty for not doing.

Moreover, National Grange's actions did not violate the contract as written. The Agency Agreement specifically provided, in clause XII. g., set forth above, that any state statute affecting the terms of the agreement would prevail over the language of the agreement. While it is true that the state insurance commissioner's Informa-

tional Letter No. 39, *supra*, is not a statute, it was properly promulgated under authority of statute:

> The [insurance] commissioner is authorized to promulgate and adopt such rules and regulations relating to insurance as are necessary to discharge his duties and exercise his powers and to effectuate the provisions of this chapter and to protect and safeguard the interests of policyholders and the public of this State.

*W. Va. Code*, 33–2–10 [1957]. Such an official statement of the State's policy, from the government agency entrusted with regulation of the subject matter, is certainly within the spirit and the intended meaning of the agreement provision that a state statute would prevail over the terms of the agreement itself.

Moreover, the termination of Mr. Shrewsbery's agency in the first place was not wrongful. By the unambiguous terms of the contract, the agency could be ended by either party on ninety days' notice. National Grange followed the contract language to the letter.

### Conclusion

For the reasons stated above, we hold that the Circuit Court of Raleigh County properly directed a verdict against the plaintiff in this case, and we affirm the judgment of that court.

Affirmed.